Anthony M. Barnes (Bar No. 199048)
Email: amb@atalawgroup.com
Theresa Trillo (Bar No. 349989)
Email: tt@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
8 Rio Vista Ave.
Oakland, CA 94611
Phone: (917) 371-8293

Erina Kwon (Bar No. 235079)
Email: erina@lawaterkeeper.org
Benjamin A. Harris (Bar No. 313193)
Email: ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E. 2nd Street, Suite 250
Los Angeles, CA 90012
Phone: (310) 394-6162

*Attorneys for Plaintiff*
LOS ANGELES WATERKEEPER

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California non-profit association, <br><br> Plaintiff, <br><br> v. <br><br> FORREST MACHINING LLC, a California Limited Liability Company, <br><br> Defendant. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

**Los Angeles Waterkeeper** ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby **alleges the following upon information and belief**:

# I.    JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). (*See* 33 U.S.C. § 1365.) This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     Pursuant to 40 C.F.R. § 135.2(a)(2), on October 31, 2024, LA Waterkeeper issued a 60-day notice letter (the "Notice Letter"), to Forrest Machining LLC, (hereinafter "Forrest Machining" or "Defendant") as the owner and operator of the Facility located at 27756 and 27712 Avenue Mentry, Valencia, CA, 91355, Waste Discharger Identification Number 4 19I027036 (the "Facility").[1] Plaintiff issued the Notice Letter to Forrest Machining' Chief Executive Officer, Chief Development Officer, the Director of Operations, and the Registered Agent, among other recipients, as the responsible owners, officers, and/or operators of the Facility.

3.     The Notice Letter was also sent to the U.S. Attorney General Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region ("Regional Board"), and the U.S. Attorney General of the U.S. Department of Justice, as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as Exhibit A and is fully incorporated herein by reference.

4.     The Notice Letter informed Defendant of its ongoing violations of substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 *et seq.* and

---

[1] The Facility is fully described in Section V below.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020) (hereafter the "Storm Water Permit" or "General Permit") and the Clean Water Act at the Facility.

5.    The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

6.    More than sixty (60) days have passed since both the Notice Letter was served on the Defendant and the State and Federal agencies. Plaintiff is informed and believes, and in turn alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. (*See* 33 U.S.C. § 1365(b)(1)(B).)

7.    This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8.    Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

9.    Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.    INTRODUCTION

10.    This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm

Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.

11.    Plaintiff specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.   PARTIES

### A. Los Angeles Waterkeeper

12.    LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper maintains an office at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

13.    LA Waterkeeper's members live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

14.    LA Waterkeeper members work, own homes and live in Los Angeles County and use and enjoy the waters near the Facility, including the Santa Clara River (the "Receiving Water") and downstream the Pacific Ocean. LA Waterkeeper members also use and enjoy the bordering parks, beaches, shorelines, pathways, golf courses, and athletic fields. They also enjoy and use other connected waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run, fish, surf, swim, sail, and recreate. LA Waterkeeper members engage in scientific study through pollution and habitat monitoring and restoration activities in and along all these waters.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

15.     Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Santa Clara River and the Pacific Ocean and impair LA Waterkeeper's members use and enjoyment of those waters. The unlawful discharge of pollutants from the Facility requires LA Waterkeeper to expend its limited resources to study and combat pollution from the Facility.

16.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

17.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

18.     The interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendant's activities.

**B. The Owners and/or Operators of the Facility**

19.     Plaintiff is informed and believes, and thereon alleges, that Forrest Machining LLC, was formed in California and is registered in California.

20.     Plaintiff is informed and believes, and thereon alleges, that Forrest Machining LLC operates an industrial facility and maintains its principle place of business at 27756 Avenue Mentry, Valencia, CA, 91355.

21.     Plaintiff is informed and believes, and thereon alleges, that Forrest Machining, LLC, is an owner and operator of the Facility.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

22.    Plaintiff is informed and believes, and thereon alleges, that the name and address of the Agent for Forrest Machining, LLC is Steve Finley with an address of 27756 Avenue Mentry, Valencia, CA, 91355.

23.    Plaintiff is informed and believes, and thereon alleges, that Eric Ellis is the Chief Executive Officer and Director of Forrest Machining, LLC.

24.    Plaintiff is informed and believes, and thereon alleges, that Narbeh Hakoupian is the Director of Operations of Forrest Machining, LLC.

25.    LA Waterkeeper refers to Defendant Forrest Machining, LLC., and its management as listed in Exhibit A, as the "Owners/Operators" of the Facility.

## IV.    STATUTORY BACKGROUND

### A. The Clean Water Act

26.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

27.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p).) States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342.)

28.    Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the

Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. (See 33 U.S.C. § 1311(b).)

29.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. (33 U.S.C. §§ 1311(a), 1342.; see 40 C.F.R. § 122.26(c)(1).)

30.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." (33 U.S.C. § 1362(12); see 40 C.F.R. § 122.2.)

31.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." (33 U.S.C. § 1362(6); see 40 C.F.R. § 122.2.)

32.    The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." (33 U.S.C. § 1362(14); see 40 C.F.R. § 122.2.)

33.    "Navigable waters" means "the waters of the United States." (33 U.S.C. § 1362(7); 33 CFR § 328.3.)

34.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." (See 33 U.S.C. §§ 1365(a)(1) and 1365(f).)

35.    The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

36.     An action for injunctive relief is authorized under Section 505(a) of the CWA, (33 U.S.C. § 1365(a).)

37.     Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after November 2, 2015, where penalties are assessed on or after December 27, 2025, commencing five (5) years prior to the date of Notice of Violation and Intent to File Suit subjects each Defendant to a penalty of up to $68,445.00 per day per violation.

38.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B. California's Storm Water Permit**

39.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. (See 33 U.S.C. § 1342(b).)

40.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. (City of Rancho Cucamonga v. Regional Water Quality Control Bd., (2006) 135 Cal. App. 4th 1377, 1380-81.) In California, the State Board is charged with regulating pollutants to protect California's water resources. (See Cal. Water Code § 13001.) The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R. § 123.25.

Violations of the Storm Water Permit are also violations of the CWA. (Storm Water Permit, Section XXI(A).)

41.  Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. (See 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).)

42.  The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

43.  On July 1, 2015, the current Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ. (Storm Water Permit, Section I(A) (Finding 4).)

44.  On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

45.  On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

46.  In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. (Storm Water Permit,

9

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Section I.A (Findings 8, 12).) Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. (Storm Water Permit, Section I.A (Finding 17), Section II.B.)

## C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

47.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. (Storm Water Permit, Discharge Prohibition III(B).)

48.    Effluent Limitations Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform.

49.    Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

50.    Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). (Storm Water Permit, Section V(A).) EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1  BAT/BCT standards. (See Final National Pollutant Discharge Elimination System

2  (NPDES) General Permit for Storm Water Discharges From Industrial Activities

3  ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector

4  Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed.

5  Reg. 64,746, 64,766-67 (Oct. 30, 2000).)

6      51.    The 2015 Multi-Sector Permit parameter Benchmarks, among others, are

7  as follows: TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen

8  ("N+N")—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L; cadmium—0.0021

9  mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0

10  mg/L; pH—6.0-9.0 s.u.; biological oxygen demand—30 mg/L; chemical oxygen

11  demand— 120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—0.47

12  mg/L; selenium—0.005 mg/L; and silver—0.0032 mg/L.[2]

13      52.    The EPA's most recent, 2021 Multi-Sector Permit parameter

14  Benchmarks for the following parameters, among others, are as follows: TSS—100

15  mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082

16  mg/L; cadmium—0.0018 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L;

17  zinc—0.12 mg/L; pH—6.0-9.0 s.u.; biological oxygen demand—30 mg/L; chemical

18  oxygen demand—120 mg/L; arsenic—0.15 mg/L; nickel—0.47 mg/L; selenium—

19  0.0031 mg/L; and silver—0.0032 mg/L.

20      53.    The Storm Water Permit contains Numeric Action Levels ("NALs") that

21  generally mirror the 2008 EPA Benchmark Values. (See Storm Water Permit, Section

22  I(M)(Finding 62).) Annual NALs, not accounting for water hardness, for the

23  following parameters are: TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L;

24  nickel—1.02 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L;

25  N+N—0.68 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen

26

27  [2] The 2015 and 2021 Multi-Sector Permit parameter Benchmarks for cadmium, nickel, silver, and

28  zinc are dependent on water hardness where discharged into freshwater. The benchmark value listed
   herein is based on a hardness of 100 mg/L.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

demand—30 mg/L; and chemical oxygen demand—120 mg/L. Storm Water Permit, Table 2 at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. (Id.)

54.     An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

55.     An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. (Stormwater Permit Section XII.A.)

56.     Receiving Water Limitation Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

57.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. (Storm Water Permit, Section VI(B).)

58.     Receiving Water Limitation Section VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

59.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

60.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

61.     The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. (Basin Plan, Table 3-8.) The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. (Id. at 3-44.) The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." (Id. at 3-29.)

62.     The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Santa Clara River.

63.     The Basin Plan specifies potential intermittent and existing beneficial uses for the Santa Clara River Reach 5 including municipal and domestic supply, industrial service supply, industrial process supply, agricultural supply, ground water recharge, freshwater replenishment, warm freshwater habitat, wildlife habitat, rare, threatened, or endangered species. (Basin Plan, Table 2-1.) Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

64.     Reach 5 of the Santa Clara River is impaired for chloride, indicator bacteria, iron, and trash. It has been proposed in the Draft California 2024 Integrated Report that Reach 5 will also be listed for aluminum and cyanide, among other pollutants. The Receiving Waters are impaired, and Defendant's discharges of pollutants above the WQS contributes to the continued impairment of the receiving waters' beneficial uses.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

65.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. (40 C.F.R. § 131.38.) The CTR sets forth lower numeric limits for copper, zinc and other pollutants; CTR criteria can be as low as, copper (0.013 mg/L) and zinc (0.12 mg/L) in freshwater surface waters with water hardness calculation of 50 mg/L.[3]

66.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. (See Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.)

67.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. (See Storm Water Permit, Section VI(A).)

**D. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

68.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. (Storm Water Permit, Sections I(I) (Finding 54) and X(B).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. (Storm Water Permit, Section X(G).) The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and

---

[3] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. (*See* Storm Water Permit, Attachment H at ¶ 18.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1  authorized non-storm water discharges. (Storm Water Permit, Section X(H).) The

2  SWPPP must include BMPs that achieve pollutant discharge reductions attainable via

3  BAT and BCT. (Storm Water Permit, Sections I(D) (Finding 32) and X(C).)

4       69.    The SWPPP must include: a narrative description and summary of all

5  industrial activity, potential sources of pollutants, and potential pollutants; a site map

6  indicating the storm water conveyance system, associated points of discharge,

7  direction of flow, areas of actual and potential pollutant contact, including the extent

8  of pollution-generating activities, nearby water bodies, and pollutants control

9  measures; a description of storm water management practices; a description of the

10  BMPs to be implemented to reduce or prevent pollutants in storm water discharges

11  and authorized non-storm water discharges; the identification and elimination of non-

12  storm water discharges; the location where significant materials are being shipped,

13  stored, received, and handled, as well as the typical quantities of such materials and

14  the frequency with which they are handled; a description of dust and particulate-

15  generating activities; and a description of individuals and its current responsibilities

16  for developing and implementing the SWPPP. (Storm Water Permit, Section X.)

17       70.    The Site Map shall include the following information: the facility

18  boundary; storm water drainage areas within the facility boundary; portions of any

19  drainage area impacted by discharges from surrounding areas and flow direction of

20  each drainage area; on-facility surface water bodies; areas of soil erosion; location(s)

21  of nearby water bodies (such as rivers, lakes, wetlands, etc.); location(s) of municipal

22  storm drain inlets that may receive the facility's industrial storm water discharges and

23  authorized Non-Storm Water Discharges (NSWDs); locations of storm water

24  collection and conveyance systems and associated points of discharge, and direction

25  of flow; any structural control measures (that affect industrial storm water discharges

26  authorized NSWDs, and run-on); all impervious areas of the facility, including paved

27  areas, buildings, covered storage areas, or other roofed structures; locations where

28  materials are directly exposed to precipitation; locations where significant spills or

leaks identified have occurred; areas of industrial activity subject to this General Permit; all storage areas and storage tanks; shipping and receiving areas; fueling areas; vehicle and equipment storage/maintenance areas; material handling and processing areas; waste treatment and disposal areas; dust or particulate generating areas; cleaning and material reuse areas; and, any other areas of industrial activity which may have potential pollutant sources. (Storm Water Permit, Attachment D.)

71.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. (Storm Water Permit, Section X.)

72.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. (Storm Water Permit, Section X(A)-(B).) The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. (Storm Water Permit, Section X(B) and Section XV.)

73.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. (Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1).) Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. (Storm Water Permit, Section X(B)(2).) Dischargers are required to submit

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. (Id. at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).)

**E. The Storm Water Permit's Monitoring Implementation Program Requirements**

74.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). (Storm Water Permit Sections X(I) and XI(A)–(D).) The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. (Storm Water Permit Section XI.) The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. (Id.)

75.     Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Storm Water Permit, Section XI.)

76.     The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. (Id.)

77.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. (Storm Water Permit, Sections I(J) (Findings 55–56) and XI.)

78.     Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

79.     Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

80.    Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. (*See* Storm Water Permit, Section XI(A)(3).) The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. (Storm Water Permit, Section X(B)(1).)

81.    The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. (Storm Water Permit, Section XI(B)(4).)

82.    Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

83.    Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

84.    Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

85.    All facilities are required to sample storm water for TSS, O&G, and pH. The Facility's NOI classifies the Facility under Standard Industrial Classification Code ("SIC") 3728 (Aircraft Parts and Auxiliary Equipment, Not Elsewhere Classified).  Facilities must sample and analyze additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. (Storm Water Permit, Section XI(B)(6).)

86.    Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**F.  Exceedance Response Action Requirements**

87.    When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." (*See* 2015 Permit, Section XII(B).) A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. (*See* Storm Water Permit, Section XII(C).)

88.    Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. (*See* Storm Water Permit, Section XII(C).) By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1  prevent future NAL exceedances and to comply with the requirements of Storm

2  Water Permit. (*See* Storm Water Permit Section XII(C)(1)(a)-(c).)

3      89.     Although the evaluation may focus on the drainage areas where the NAL

4  exceedance(s) occurred, all drainage areas shall be evaluated. (See Storm Water

5  Permit, Section XII(C)(1)(c).)

6      90.     Based upon this Level 1 status evaluation, the permittee is required to, as

7  soon as practicable but no later than January 1 following commencement of Level 1

8  status, revise the SWPPP as necessary and implement any additional BMPs identified

9  in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response

10 Action ("ERA") Report prepared by a QISP that includes the a summary of the Level

11 1 ERA Evaluation and a detailed description of the SWPPP revisions and any

12 additional BMPs for each parameter that exceeded an NAL. (See Storm Water

13 Permit, Section XII(C)(2)(a)(i)-(ii).)

14     91.     The permittee in Level 1 status must also certify and submit via

15 SMARTS the QISP's identification number, name, and contact information

16 (telephone number, e-mail address) no later than January 1 following commencement

17 of Level 1 status. (See Storm Water Permit, Section XII(C)(2)(a)(iii).)

18     92.     A permittee's Level 1 status for a parameter will return to Baseline

19 status once a Level 1 ERA Report has been completed, all identified additional BMPs

20 have been implemented, and results from four (4) consecutive qualified storm events

21 that were sampled subsequent to BMP implementation indicate no additional NAL

22 exceedances for that parameter. (See Storm Water Permit, Section XII(C)(2)(b).)

23     93.     A permittee's Level 1 status for any given parameter shall change to

24 Level 2 status if sampling results indicate an NAL exceedance for that same

25 parameter while the Discharger is in Level 1. Level 2 status commences on July 1

26 following the reporting year during which the NAL exceedance(s) occurred. (See

27 Storm Water Permit, Section XII(D).)

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

94.     A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. (*See* Storm Water Permit, Section XII(D).)

V.     **STATEMENT OF FACTS**

**A.  Forrest Machining Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility**

95.     Defendant operates an industrial facility located at 27756 Avenue Mentry, Valencia, California with a footprint of approximately nine (9) acres. Pursuant to the Facility SWPPP two (2) buildings exist at the Facility—Building 1 at 27756 Avenue Mentry and Building 2 at 27712 Avenue Mentry. The Facility site map identifies the buildings as non-industrial and the areas in between the buildings and adjacent to Newhall Ranch Road as industrial areas. The SWPPP also notes that industrial activities and materials associated with areas adjacent to Building 1 include equipment, tool & parts storage, recyclable material (metal shavings) staging, intermediate production storage, and raw material storage. The industrial activities/materials associated with areas west of the Building 2 include equipment, tool & part storage, recyclable material (metal shavings) staging, intermediate production storage, raw material storage, and hazardous waste accumulation area. Industrial activities/materials associated with the northeast of the Building 2 include water treatment plant, industrial waste water storage, and bulk liquid raw material storage. The SWPPP also identifies outdoor storage areas for recyclable metal shavings  and idle equipment. The Facility SWPPP notes that the Facility operates five (5) days per week from 6:00 AM to 2:30 AM Monday through Thursday and 6:00 AM to 10:50 PM on Friday.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

96.     The Facility's primary industrial purpose is the design and manufacture of complex machined components, tooling, mechanical assemblies, frames, using a variety of alloys and other materials for the aerospace and aeronautics industries.

97.     The Facility NOI and SWPPP note that the site is 90% impervious, and the SWPPP states that the10% of the remaining areas are vegetated of erodible with two (2) manufacturing buildings, two (2) attached bin, tool, and parts storage awnings and two (2) attached dry storage warehouses at the site.

98.     Forrest Machining industrial activities include parts manufacturing, CNC milling, metal finishing, industrial cleaning, equipment and vehicle maintenance, recycling, truck loading and unloading, outdoor bin storage, outdoor equipment storage. The Facility conducts industrial activities outdoors which are exposed to storm water, and indoor industrial activities are subject to pollutant tracking and escaping through roof venting and doors and thus exposed to storm water. Industrial storm water at the Facility is impacted by outdoor equipment storage, metal shaving storage, track out of numerous pollutants, cutting fluid and fugitive metal shavings from interior metal fabrication and milling operations, and releases of pollutants from bin storage and truck loading, unloading, traffic, and parking.

99.     Pollutants from these industrial areas and activities described herein accumulate at the Facility and are eventually discharged in storm water. Pollutants contributing to poor storm water quality at the Facility include TSS, aluminum, zinc, iron, copper, pH affecting substances, and O&G.

100.    The previous Facility SWPPP identifies two (2) storm water drainage areas: 1) the paved area between the two buildings including the truck loading dock and ramp and the storage areas behind and north of the manufacturing buildings; and 2) the westernmost paved area to the north and west of Building 1. Area 1 is identified as the primary industrial storm water drainage area. Area 2 is described as a small area in the northwest corner of the property that is said to discharge

22

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

approximately five percent (5%) of all industrial storm water from the Facility. The current Facility SWPPP only identifies a single drainage area, Area between Building 1 and Building 2 – including the impervious paved areas north of Building 2, except the westernmost twenty percent 20% of the rear yard of Building 1.

101.   Surface drainage at the Facility is engineered to flow in drainage swales towards the street and onward to storm drain inlets. Some storm water discharged from the Facility is through wattles prior to discharging to the street and flowing into the inlets to the Los Angeles Municipal Separate Storm Sewer System ("MS4") which flows to the Santa Clara River. Storm water roof runoff flows through channels and downspouts flanking both buildings prior to entering the Facility swales and channels directing storm flow south through the main gate area of the Facility where it eventually enters the MS4 drain inlet and then onto the Santa Clara River.

102.   The storm water discharge sampling location at the Facility is located in the swale at the southern boundary of the industrial storm water drainage area between the buildings at the Main Gate.

103.   Forrest Machining discharges into the Santa Clara River which flows to the Pacific Ocean. The Santa Clara River and the Pacific Ocean are waters of the United States under the CWA and receive storm water discharges from the Facility.

**B. The Santa Clara River**

104.   LA Waterkeeper's members utilize the Receiving Waters for recreation, scientific study through pollution and habitat monitoring and restoration activities. LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Santa Clara River.

105.   The Santa Clara River, at approximately 100 miles (161 kilometers) in length with a 1200 square mile (3,108 square kilometer watershed), is the largest river system in southern California that remains in a relatively natural state. (Basin Plan at I-29.)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

106.   "Threats to water quality include increasing development in floodplain areas (particularly in the upper watershed), necessitating flood control measures such as channelization that results in increased flows, erosion, and loss of habitat. In many of these highly disturbed areas the exotic giant reed (Arundo donax) is gaining a foothold. Increasing loads of nitrogen (from irrigation and onsite wastewater treatment discharges) and salts such as chloride (from irrigation and publicly owned treatment works (POTW) discharges) in surface and groundwaters threaten beneficial uses, including irrigation and drinking water supply. Additionally, stream flows are diverted, usually during high flow, for groundwater recharge or direct delivery; wells are then pumped for municipal and agricultural uses. Thirty-six percent of the watershed is controlled by dams such as Santa Felicia and Pyramid Dams on Piru Creek and Castaic Dam on Castaic Creek. The hydrology of the river is complex; perennial flows occur in some portions of the river before disappearing into the permeable bed material and then reappearing further downstream where groundwater surfaces. Groundwater underlying the Santa Clarita Valley in the upper watershed has been impacted by perchlorate contamination. The chemical was originally detected in four Saugus wells in 1997 near the former Whittaker-Bermite industrial facility. Since then, the wells have been out of water supply service. Remediation of the perchlorate and restoration of the impacted well capacity is underway (CRWQCB-LA, 2006 and 2007)." (Basin Plan at I-30.)

107.   "Significant Biological Resources described in Ventura County's General Plan include the extensive patches of high quality riparian habitat that are present along the length of the river and its tributaries. Also considered significant are areas such as the wetlands found at the Santa Clara River estuary, along the river itself, bordering lakes, and at isolated low-lying areas within the watershed such as the "Pothole" in the Devil's Potrero (on Agua Blanca Creek) that supports several species of plants unique to freshwater marshes (Ventura County, 2010). In the upper part of the watershed, within Los Angeles County, SEAs have been designated

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

including: (1) the Santa Clara River SEA, which also includes the previously designated Kentucky Springs SEA (a distinctive stand of great basin sagebrush) and the previously designated San Francisquito Canyon SEA (which provides habitat for the endangered threespine stickleback); (2) the Santa Susana and Simi Hills SEA, which includes the previously designated Lyons Canyon SEA (a chaparral and oak woodland); and (3) the Valley Oaks Savannah near Newhall (LA County, 1980 and 2011)." (Basin Plan at I-30-31.)

**C. The Facility Storm Water Permit Coverage**

108.   SMARTS lists the current Facility WDID number for the Facility as 4 19I030499 and coverage under the Storm Water Permit as "Active."

109.   The NOI for the Facility lists the Receiving Water as the Santa Clara River.

110.   Via search of the SMARTS database, Plaintiff obtained the Facility SWPPP for the Facility, last revised in 2024.

111.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been operating with an inadequately developed or implemented SWPPP in violation of Storm Water Permit requirements since at least October 31, 2019. Defendant has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

112.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the Storm Water Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the Storm Water Permit.

113.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

114.    Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to: O&G, TSS, aluminum, copper, iron, and pH.

115.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. (Storm Water Permit, Sections X(H)(1)(a)–(g).) As evidenced by the sample results, the BMPs that are described in the Facility's SWPPP are insufficient to prevent the NAL exceedances for constituents listed above, and the Facility's Monitoring Implementation Plan needs improvement.

116.    Forrest Machining has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its storm water sufficient to meet the BAT/BCT standards, including, but not limited to: exposure minimization BMPs; containment and discharge reduction BMPs; and treatment limitations. (General Permit Section X.H.2.) Plaintiff is informed and believes that BMPs at the Facility are insufficient to prevent Permit violations t

117.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least October 31, 2019.

118.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges containing excess levels of, at least, O&G, zinc, copper, pH, and iron, occur each time storm water discharges from Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

119.    Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedances of NALs, CTR, and Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement

BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

120.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant failed to update the Facility's training programs or implement other changes in response to events that required revisions or altered practices.

121.   Plaintiff is informed and believes, and thereon alleges, that pollutants, including, but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

122.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address pollutant sources and pollutants result in the exposure of pollutants associated with its industrial activities to precipitation, and this results in discharges of polluted storm water from the Facility into the Receiving Waters in violation of the Storm Water Permit and/or the CWA.

**D.   Storm Water Discharges from the Facility**

123.   As discussed above and as detailed in the Facility SWPPP, there multiple storm water discharge points at the Facility and one (1) sampling point.

124.   Plaintiff is informed and believes, and thereon alleges, that Forrest Machining has self-reported NAL exceedances from the Facility over the past five (5) reporting years and would have had more exceedances had it conducted the requisite sampling.

**E. The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

125.   Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility's storm water discharges to the Santa Clara River, which flows downstream into the Pacific Ocean.

126.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into the Santa Clara River, which then flows into the Pacific Ocean, all waters of the United States.

127.   Storm water discharges containing pollutants including, but not limited to, heavy metals such as zinc, copper, and iron adversely affect the aquatic environment.

128.   Forrest Machining has never sampled aluminum despite conducting activities that generate this pollutant. LA Waterkeeper is informed and believes that had Forrest Machining adequately sampled for this parameter, it would have had exceedances.

129.   Samples of storm water discharges collected at the Facility contain pollutants in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

130.   Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event (a rain event of 0.1 inches or more will generally produce storm water runoff from industrial facilities). Defendant has discharged and continues to discharge storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

**F.  Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements**

131.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to develop an adequate Monitoring Implementation

1 Plan ("MIP") for industrial operations at the Facility that complies with Section XI of

2 the Storm Water Permit.

3       132.   Plaintiff is informed and believes, and thereon alleges, that Defendant

4 has failed and continues to fail to revise the MIP for the Facility as necessary to

5 ensure compliance with the Storm Water Permit in violation of Section XI of the

6 Storm Water Permit.

7       133.   Plaintiff is informed and believes, and thereon alleges, that Defendant

8 has failed and continues to fail to implement the MIP at the Facility, in violation of

9 Section XI of the Storm Water Permit.

10       134.   Plaintiff is informed and believes, and thereon alleges, that Defendant

11 has failed and continues to fail to collect or analyze sufficient storm water samples at

12 the Facility, in violation of Section XI of the Storm Water Permit.

13       135.   Plaintiff is informed and believes, and thereon alleges, in certain of the

14 past five (5) reporting years, the Owners/Operators of the Facility failed to collect the

15 requisite four storm water samples.

16       136.   Plaintiff is informed and believes, and thereon alleges, that the sampling

17 points are not representative of the pollution at the Facility as much of the storm

18 water does not flow to the sampling point.

19       137.   Plaintiff is informed and believes, and thereon alleges, that since

20 Defendant has failed and continues to fail to collect sufficient and consistent storm

21 water samples, such as the instances described in the paragraphs above, the

22 documented exceedances are not a true representation of the exceedances discharged

23 by the Facility. If Defendant were collecting and analyzing sufficient storm water

24 samples, there would be a greater number of documented exceedances.

25       138.   Plaintiff is informed and believes, and thereon alleges, that Defendant

26 has failed and continues to fail to adequately revise the MIP for the Facility as

27 necessary to ensure compliance with the Storm Water Permit in violation of Section

28 XI of the Storm Water Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

139.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

140.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted.

141.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators failed to report their non-compliance as required by the Storm Water Permit.

142.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility failed to collect sufficient storm water samples during QSEs.

143.   Based on information available to Plaintiff, it is informed and believes, and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP are insufficient and ineffective in reducing pollutants to levels compliant with the Storm Water Permit and/or the CWA.

144.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to submit accurate Annual Reports to the Regional Board for the past five (5) reporting years in violation of Section XVI of the Storm Water Permit.

145.   Plaintiff is informed and believes, and thereon alleges, that during the certain reporting years Forrest Machining was in ERA Level 1 for certain pollutants.

///

///

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

146.    Plaintiff incorporate the allegations contained in the above paragraphs as though fully set forth herein.

147.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

148.    Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. (See Storm Water Permit, Sections I(D) (Finding 32)V(A); 33 U.S.C. § 1311(b).)

149.    The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

150.    Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

151.    Each day, since at least October 31, 2019, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

152.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 31, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

153.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

154.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

155.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SECOND CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water
in Violation of the Storm Water Permit's
Receiving Water Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

156.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

157.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

158.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to standards set forth in the applicable

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Basin Plan, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

159.    The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

160.    Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

161.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

162.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 31, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

163.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

164.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

165.    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

1
2
3
4

### THIRD CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

5
6

166.    Plaintiff incorporates the allegations contained in the above paragraphs though fully set forth herein.

7
8
9

167.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

10
11
12

168.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP for the Facility, in violation of the Storm Water Permit.

13
14
15

169.    Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

16
17

170.    The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from October 31, 2019, to the present.

18
19

171.    The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

20
21
22

172.    The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

23
24

173.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

25
26
27

174.    By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 31, 2019, to the present, pursuant to

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

175.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

176.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

177.    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

178.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

179.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

180.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

181.    Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

182. The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from October 31, 2019, to the present.

183. The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

184. The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

185. Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

186. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 31, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

187. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

188. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

189. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

///

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water
Permit in Violation of the Storm Water Permit and the
Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

190.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

191.   Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. (Storm Water Permit, Section XVI.) Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

192.   The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. (See Storm Water Permit, Section XX(B).)

193.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit.

194.    Further, Defendant has repeatedly failed to submit required ERA Level 1 and/or Level 2 Reports, despite entering into those levels for various constituents. As such, Defendant is in daily violation of the Storm Water Permit Section XII.

195.    The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least October 31, 2019.

196.    The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

197.    By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 31, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

198.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

199.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

200.    WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.    **RELIEF REQUESTED**

201.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

a.    A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

b.    A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.    A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, where penalties are assessed on or after December 27, 2025, of $68,445 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.    A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

e.    Any other relief as this Court may deem appropriate.

Dated: April 1, 2025                      Respectfully submitted,


                                          /s/ Anthony M. Barnes
                                          Anthony M. Barnes
                                          Theresa Trillo
                                          AQUA TERRA AERIS LAW GROUP
                                          Attorneys for Plaintiff
                                          LOS ANGELES WATERKEEPER

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES